IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **DELBERT JOHNSON** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:14-CV-01016-Y |
| **CITY OF FORT WORTH,** | § | |
| **JEFFREY HALSTEAD, individually,** | § | |
| **AND RHONDA K. ROBERTSON,** | § | |
| in her official capacity of Chief of Police | § | |
| of the Fort Worth Police | § | |
| Department, | | |
| | | |
| *Defendants*. | | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff DELBERT JOHNSON (Plaintiff or "Johnson") files this first amended complaint and jury demand against Defendants CITY OF FORT WORTH ("Fort Worth"), JEFFREY HALSTEAD ("Halstead"), individually, and RHONDA K. ROBERTSON, in her official capacity of Chief of Police of the Fort Worth Police Department, alleging race discrimination, harassment, hostile work environment, and retaliation under 42 U.S.C. §§1981( by and through 42 U.S.C.§1983) and §1983. For cause of action, Plaintiff would show the Court as follows:

### I. PARTIES, JURISDICTION AND VENUE

1.     Johnson is a male resident and citizen of Fort Worth, Tarrant County, Texas. and performed work for Fort Worth in Fort Worth, Texas during the time period giving rise to the claims in this litigation.

2.     Fort Worth is a municipality in Texas.

3. Halstead was at all times relevant to this action the Chief of Police at the Fort Worth Police Department. Robertson became Chief of Police after the filing of this lawsuit, and was substituted for Halstead with respect to Plaintiff's official-capacity claims.

4. This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §1331 and §1343(a). The court has original jurisdiction.

5. A substantial part of the events or omissions giving rise to Johnson's claims happened within the Northern District of Texas and venue is proper in this District under 28 U.S.C. §1391.

### III. FACTUAL BACKGROUND

6. The Fort Worth Police Department ("FWPD") hired Sgt. Johnson in 1990 as a Police Officer. Sgt. Johnson is a 24 year veteran of the FWPD. During his tenure, he has been assigned to various positions, including Peer Counselor, Police Honor Guard, Weed and Seed, Field Training Officer, Auto Theft Detective, and Background Investigator at the Police Academy. After being promoted to the rank of Sergeant in 2000, he was assigned to work the day shift South Division Patrol. In 2005, because of his impressive administrative skills, Deputy Chief, T.J. Brown (now retired), transferred Sgt. Johnson to the Day Shift Traffic Division with Saturdays and Sundays off.

7. Up until 2010, things were good for Sgt. Johnson, and he treasured every day to be working in a job that made him very happy. That changed the day that a fellow Police Officer (James Dunn) approached him and told him about an offensive picture that was left on the office printer. The picture showed Sgt. Ann Gates holding a noose around a snowman's neck. Sgt. Mike Cagle had taken the picture of Sgt. Gates. As African-Americans, both Officer Dunn and Sgt. Johnson were offended by the connotations that picture brought up.

8. Someone other than Sgt. Johnson complained about the inappropriate picture to

Internal Affairs. After its investigation was concluded, Internal Affairs found that Sgt. Gates and Sgt. Cagle had violated FWPD policies and general orders. Accordingly, the FWPD issued a Commander's Admonishment to Sgt. Gates and Sgt. Cagle for this incident.

9.    After Sgt. David Stamp heard about the Commander's Admonishment that Sgt. Gates and Sgt. Cagle received, he gathered a select group of supervisors within the Traffic Division, Sgt. Gates, Sgt. Cagle, and Sgt. Tim Ellis, and told them how upset he was with Sgt. Gates' and Sgt. Cagle's admonishment, and that they should all watch out for and avoid Sgt. Johnson (the only African American supervisor assigned to the Traffic Division), who was now their enemy and could not be trusted.

10.   Sgt. Stamp then commenced a blatant and unrelenting campaign to ruin Sgt. Johnson and his career with the FWPD. Sgt. Stamp's actions included publicly criticizing Sgt. Johnson to other supervisors, officers, and civilian employees, conspiring with others to boycott certain meetings and assignments overseen by Sgt. Johnson, and attempting to sabotage some of Sgt. Johnson's supervisory assignments by trying to convince other officers not to work on a major grant overseen by Sgt. Johnson. The worst part, however, was when Sgt. Stamp sent an anonymous letter in the latter part of 2012 to Chief Jeff Halstead accusing Sgt. Johnson of the criminal act of stealing money from the Federal Grant that he had been in charge of. Although the letter was sent from an anonymous person, just three days later, Sgt. Stamp told investigators in the Special Investigation Unit (SIU) that he had sent it and that he would help in any way possible in their investigation of Sgt. Johnson.

11.   As a result of Sgt. Stamp's false and malicious complaint, Sgt. Johnson has been subjected to numerous audits by no less than three investigative teams: 1) FWPD's Special Investigations Unit, 2) FWPD's Grant Administration Office, and 3) the Texas Department of Transportation. Significantly, all three of these investigative units found absolutely no evidence

of any wrongdoing on Sgt. Johnson's part. Indeed, one of the investigators, Jami Hoffman, told Sgt. Johnson that the financial records that he had kept regarding the grant were impeccable. Additionally, Kathy Neely, a Grant Administrator from the Texas Department of Transportation, also informed Sgt. Johnson's entire chain of command that the way Sgt. Johnson supervised the grant could be used as a model not just for the State of Texas, but for the entire nation. An Internal Affairs investigator even told Sgt. Johnson that "Sgt. Stamp tried to take you down hard" even though he "had no knowledge of how that particular grant was operated."

12. Despite these investigations completely clearing Sgt. Johnson of wrongdoing, Sgt. Stamp continued his false and malicious accusations against Sgt. Johnson. It was disclosed to Sgt. Johnson that Sgt. Stamp was now saying that the only reason that Sgt. Johnson was not arrested was because he was black. As a result of Sgt. Stamp's false accusations and discriminatory behavior, Sgt. Johnson filed a complaint with FWPD's HR Department in March 2013, alleging a pattern and practice of pervasive race discrimination, harassment, hostile work environment, and retaliation for his prior complaints of discrimination and harassment. Since this was an ongoing situation, Sgt. Johnson filed several follow-up complaints as well. After making Sgt. Johnson wait thirty-seven days, Chief Halstead finally agreed to meet with Sgt. Johnson on June 28, 2013 to discuss Sgt. Johnson's complaints and the harassment and discrimination that he was experiencing. Although Chief Halstead told Sgt. Johnson that he would "make it right," he actually did just the opposite.

13. In September 2013, Chief Halstead discriminated and retaliated against Sgt. Johnson when he transferred him out of the Traffic Division to Second Shift West Division. This involuntary transfer to one of the worst shifts in the entire police department had a severely negative impact on Sgt. Johnson. This transfer changed Sgt. Johnson's work schedule from day shift 6:00 a.m. to 2:00 p.m. Monday through Friday to the 4:00 p.m. to 2:00 a.m. shift working

Friday through Monday. This was a punch to Sgt. Johnson's gut, completely changing the quality of his and his family's personal lives and likewise severely impacting the amount of compensation he was making because he no longer got overtime hours that he had been receiving when he was in Traffic. Additionally, the transfer and shift change resulted in the loss of a part-time secondary job that he held for eleven years, costing Sgt. Johnson thousands of dollars in lost income. All told, the amount Sgt. Johnson lost in income is approximately $50,000.00.

14. What made matters even worse concerning the involuntary and retaliatory transfer of Sgt. Johnson was that he put in for a transfer to an open position of Jail Sergeant several weeks earlier. Despite the fact that the hiring official wanted Sgt. Johnson and no one else applied for the position, the FWPD refused to give Sgt. Johnson the job. Indeed, Sgt. Johnson was told that upper level officials at the FWPD, including Chief Halstead, specifically refused to allow the hiring official to give Sgt. Johnson the position, and required that the open position posting be taken down.

15. At this point, the discriminatory and retaliatory actions of the FWPD were so out of control, other complaints were also filed. Lt. Glenn Edney and leaders of the Fort Worth Black Police Officers Association filed complaints alleging race-based discriminatory and retaliatory treatment and harassment by supervisory and senior level officers within the Department. Since the continuing pattern of harassment, discrimination, and retaliation continued unabated, both Sgt. Johnson and Lt. Edney filed complaints with the Mayor and City Manager. At some point after these other complaints were filed, the City retained Coleman & Associates to perform an independent investigation of all of these complaints, including Sgt. Johnson's.

16. The Coleman Report came out earlier this year. After a thorough investigation,

Coleman found that the FWPD had tolerated and allowed a hostile work environment over a three year time period that was based on race and retaliation for Sgt. Johnson's prior complaints of race discrimination and harassment. This was a highly publicized report that generated many news reports. It also resulted in the extraordinary measure of Chief Halstead publicly apologizing for the racial and retaliatory animus that was so pervasive within the Department. In the video that was posted on YouTube, Chief Halstead admitted that Sgt. Johnson and Lt. Edney were discriminated against because of the color of their skin.

17. As a further result of the Coleman Report, Sgt. Johnson was transferred back to the Traffic Division in April of this year. It would seem at face value that Sgt. Johnson would have been pleased to return to the Traffic Division. However, his initial pleasure at being returned to Traffic was severely tempered when the head of the Traffic Division, Deputy Chief Martin Salinas, announced to multiple persons that he was not happy that Sgt. Johnson was returning. Deputy Chief Salinas also directly informed Sgt. Johnson that he did not care what Chief Halstead said or did, but he did not want Sgt. Johnson back in the Traffic Division. This is just one more example of the poisoned atmosphere that Sgt. Johnson has had to endure over the last four years.

18. The almost four years of continuing race discrimination, harassment, and retaliation has taken a severe emotional toll on Sgt. Johnson and his family. The emotional distress and mental anguish he has suffered is significant to say the least. He is simply no longer the happy go lucky fellow that he was prior to the four-year tornado that he and his family have been through at no fault of their own.

### I. CAUSE OF ACTION: SECTION 1983 – RACE DISCRIMINATION, HARASSMENT, HOSTILE WORK ENVIRONMENT, AND RETALIATION

19. Plaintiff realleges and incorporates the allegations in paragraphs 1-18 as if fully stated herein.

20. All conditions precedent to the filing of this action have occurred or have been fulfilled.

21. Plaintiff was an employee of Fort Worth.

22. Defendants willfully discriminated, harassed, created and tolerated a hostile work environment, and retaliated against Johnson as described above.

23. As a result of the unlawful discriminatory and retaliatory actions of Defendants as described above, Defendants have violated the provisions of Section 1983 in that acting under color of law, they, jointly and/or severally, deprived Plaintiff of his rights, privileges, and/or immunities as provided by the Constitution of United States and its Laws.

24. Defendants acted with intent to violate or with reckless indifference to Plaintiff's clearly established rights under the First and Fourteenth Amendments.

25. Plaintiff has suffered, and will continue to suffer, actual damages, compensatory damages, emotional distress, loss of reputation, and humiliation, for which he hereby seeks to recover.

26. Defendants' conduct constitutes a willful violation of Section 1983, entitling Plaintiff to recover punitive damages.

27. Plaintiff also seeks attorneys' fees, reasonable expert witness fees, and costs of the action.

## II. CAUSE OF ACTION: SECTION 1981 (THROUGH SECTION 1983)–RACE DISCRIMINATION, HARASSMENT, HOSTILE WORK ENVIRONMENT, AND RETALIATION

28. Plaintiff realleges and incorporates the allegations in paragraphs 1-27 as if fully stated herein.

29. All conditions precedent to the filing of this action have occurred or have been fulfilled.

30. Plaintiff was an employee of Fort Worth.

31. Defendants, through their agents, supervisors, and employees, willfully discriminated, harassed, created and tolerated a hostile work environment, and retaliated against Johnson as described above. This discrimination, harassment, hostile work environment, and retaliation was created and tolerated at the highest level of the City, including Chief Halstead. These illegal actions were done pursuant to a custom or policy of the local government.

32. Defendants violated Plaintiff's civil rights in violation of 42 U.S.C. §1981, by and through 42 U.S.C. §1983. The violation of Plaintiff's civil rights was continuous in nature.

33. As a result of the unlawful discriminatory and retaliatory actions of Defendants as described above, Defendants have violated the provisions of Sections 1981 and 1983, jointly and/or severally, which led to the loss and impairment, in whole or in part, of the wages, benefits, privileges, and terms and conditions of Plaintiff's employment.

34. Defendants acted with intent to violate or with reckless indifference to Plaintiff's clearly established rights under Sections 1981 and 1983.

35. Plaintiff has suffered, and will continue to suffer, actual damages, compensatory damages, emotional distress, loss of reputation, and humiliation, for which he hereby seeks to recover.

36. Defendants' conduct constitutes a willful violation of Sections 1981 and 1983,

entitling Plaintiff to recover punitive damages.

37.     Plaintiff also seeks attorneys' fees, reasonable expert witness fees, and costs of the action.

## VI. JURY DEMAND

38.     Johnson hereby demands a jury trial on all issues, claims, actions, and defenses in this case.

## VII. PRAYER FOR RELIEF

WHEREFORE, Johnson requests that Defendants be summoned to appear and answer, and that on final trial, judgment be granted against Defendants, jointly and severally, awarding Johnson the following:

- a.   Actual damages;

- b.   Compensatory damages, including damages for emotional distress, loss of reputation, and humiliation;

- c.   Punitive damages;

- d.   Injunctive relief enjoining Defendants from engaging in unlawful practices in violation of Sections 1981 and 1983;

- d.   Prejudgment and post-judgment interest, in the maximum amount allowed by law;

- f.   Attorneys' fees, expert fees, and costs of suit; and

- g.   Such other and further legal and equitable relief to which Plaintiff may be justly entitled.

Respectfully submitted,

**LYON, GORSKY, GILBERT & LIVINGSTON, L.L.P.**
12001 North Central Expressway
Suite 650
Dallas, Texas 75243
Phone: (214) 965-0090
Fax:    (214) 965-0097


By: */s/ David K Watsky*
    David Watsky
    State Bar Number 20932600
    Bob Gorsky
    State Bar Number 08221200
    John Snider
    State Bar Number 24063556

    **ATTORNEYS FOR PLAINTIFF**


### CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2015, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to all counsel.

*/s/ David K. Watsky*
David K. Watsky